# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

KANDEE GILBERT LEWIS,                          CASE NO. 1:00-CV-5445-AWI-DLB-P

                Plaintiff,          FINDINGS AND RECOMMENDATIONS
                                   RECOMMENDING DEFENDANTS' MOTION
   v.                                   FOR SUMMARY JUDGMENT BE GRANTED

BARON, et al.,                                 (Doc. 129)

                Defendants.

_____/

A.    <u>Procedural History</u>

       This is a civil rights action filed by plaintiff Kandee Gilbert Lewis ("Plaintiff"), a state prisoner proceeding pro se and informa pauperis, pursuant to 42 U.S.C. § 1983. This action is proceeding on Plaintiff's second amended complaint, filed January 5, 2001, against defendants Baron, Castellanos, Eby, I. Kent, S. Kent, Rawlings, Schei, Sooter and Wilson. Plaintiff alleges that defendants failed to take appropriate action to protect her from an attack by another inmate on May 23, 1999. Plaintiff also alleges that defendant Rawlings failed to provide her appropriate medical treatment for her injuries.[1]   On December 22, 2005, defendants filed a motion for summary judgment. Plaintiff filed an opposition on March 31, 2006.

---

[1] Plaintiff's claim against the State of California was dismissed on September 18, 2000 by District Judge Ishii. By order filed January 29, 2001, District Judge Ishii dismissed defendants Farmon, Mekkam and Hernandez from this action. On June 4, 2003, defendants Adams, Scott and Champ were dismissed from this action for failure to state a claim.

B.    Plaintiff's Motion to Postpone Consideration of Defendants' Motion for Summary Judgment.

In her opposition, plaintiff requests a stay of this motion and additional time to conduct discovery.  Rule 56(f) of the Federal Rules of Civil Procedure provides as follows:

> (f) When Affidavits are Unavailable.  Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The Ninth Circuit has explained that in order to prevail on a Rule 56(f) motion, the party "must show (1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion."  State of California v. Campbell, 138 F.2d 772, 779 (9th Cir. 1998). "In making a Rule 56(f) motion, a party opposing summary judgment 'must make clear what information is sought and how it would preclude summary judgment.'"  Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998) (quoting Garrett v. City and County of San Francisco, 818 F.2d 1515, 1518 (9th Cir. 1987)).  The burden is on the party seeking to conduct additional discovery to put forth sufficient facts to show that the evidence sought exists.  Volk v. D. A. Davidson & Co., 816 F.2d 1406, 1416 (9th Cir. 1987).

Plaintiff has not met her burden as the party moving for relief from responding to defendant's motion pending further discovery.  Plaintiff's conclusory statement that she has not had ample time to conduct discovery because she was awaiting a settlement offer from defendants does not provide a basis to postpone ruling on defendants' motion for summary judgment.  She has not identified any specific discovery she requires to oppose the motion or how it might preclude summary judgment. This case has been pending since March 17, 2000.  Discovery was opened in December 2004 and prior to that the parties engaged in extensive briefing on the issues.  The deadlines in this case have been extended on multiple occasions and plaintiff was given an extension in which to file her opposition to the motion for summary judgment.  Given the history of this case, Plaintiff's conclusory assertion that she needs to conduct discovery is insufficient to support a Rule 56(f) motion and her request to postpone ruling on this motion and reopen discovery is denied.

2

1    B.    Summary Judgment Standard

2    Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

3  as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.

4  Civ. P. 56(c).  Under summary judgment practice, the moving party

5        [A]lways bears the initial responsibility of informing the district court
         of the basis for its motion, and identifying those portions of "the
6        pleadings, depositions, answers to interrogatories, and admissions on
         file, together with the affidavits, if any," which it believes
7        demonstrate the absence of a genuine issue of material fact.

8  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It is the moving party's burden to establish that

9  there exists no genuine issue of material fact and that the moving party is entitled to judgment as a

10  matter of law.  British Airways Board v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978).

11    As to defendant's motion for summary judgment, "where the nonmoving party will bear the

12  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

13  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"

14  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Indeed, summary judgment should be entered,

15  after adequate time for discovery and upon motion, against a party who fails to make a showing

16  sufficient to establish the existence of an element essential to that party's case, and on which that

17  party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an

18  essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.

19  In such a circumstance, summary judgment should be granted, "so long as whatever is before the

20  district court demonstrates that the standard for entry of summary judgment, as set forth in Rule

21  56(c), is satisfied."  Id. at 323.

22    If the moving party meets its initial responsibility, the burden then shifts to the opposing

23  party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

24  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence

25  of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

26  required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

27  material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475

28  U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e.,

3

a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

C.    <u>Statement of Undisputed Facts</u>

1.    At all times relevant to this action, Plaintiff was an inmate housed at the Central California Women's Facility (CCWF) in Chowchilla, California. Am Compl. p.1.

2.  At all times relevant to this action, Defendants were employed by the California Department of Corrections and Rehabilitation and worked at CCWF.  Am. Compl.

3.  On Thursday, May 20, 1999, inmate McMillan was released from the Enhanced Out-Patient Program and placed in 506-03 with Plaintiff and six other inmates.  Am. Compl. p.1.

4.  On Friday, May 21, 1999, McMillan was acting strangely and stated to Plaintiff that she had not eaten all day, nor received her medication.  She also stated that she was receiving psychiatric medication and medication for diabetes.  Plaintiff fed McMillan fruit, soup and crackers, then informed housing staff and Officer Schei.  Am. Compl. p. 1.  McMillan was not acting violently toward anybody at that time.  Plaintiff's concern was for McMillan, not for herself.  Depo. Gilbert-Lewis, 12:24-25 - 13:1.

5.  On Saturday, May 22, 1999, at about 10:15 a.m., McMillan began banging her head on the bathroom wall and pulling her hair out.  Officer Castellanos responded to the room, viewed McMillan's injury and recorded the occurrence in the officers' daily log book.  Am. Compl. p.1.

6.  Later the same day, McMillan was observed talking to herself in the mirror, saying she was bad, ugly and evil.  When the roommates attempted to comfort her, McMillan entered the bathroom stall and began throwing toilet paper rolls at several of the roommates.  Officer Castellanos responded and referred McMillan to the B-yard clinic for evaluation.  McMillan was seen in the clinic and later returned to her room.  Am. Compl. p.1.

7.  During the relevant time period, Officer Castellanos was working as a correctional officer in housing unit 506.  He was assigned to unit 506 one day a week which was Saturdays and he worked second watch which is from 6:30 a.m. to 2:30 p.m.  It is Officer Castellanos' practice to remove any inmate from a situation where he believes the inmate poses a threat to herself or another person.  If Officer Castellanos had seen any signs that led him to believe that it was not safe for McMillan to remain in that particular room, he would have contacted his supervisor immediately to have McMillan moved.  If any of McMillan's roommates had stated that McMillan had threatened them or was behaving in a threatening manner toward them, he would have taken action to have her moved.  It is and has always been Officer

1   Castellanos' practice and custom to act in this manner.  If he did not take such action, that

2   indicates at the time, he did not have any reason to believe that McMillan was a threat to

3   anyone.  Decl. of P. Castellanos, ¶¶ 4-6.

4   8.   On Sunday, May 23, 1999, at about 5:30 p.m., correctional officer Sooter and Lewis found

5   McMillan in the bathroom crying.  Feces were smeared on the walls and there was blood on

6   the floor.  Officer Sooter called a female officer to assist him in getting McMillan out of the

7   bathroom because she refused to come out and was exposed from the waist down.  Am.

8   Compl. p. 2.  Plaintiff stayed with McMillan and tried to assist her while Officer Sooter went

9   to get a female officer.  Depo. of Gilbert-Lewis, 20:15-18, 21:6-7.

10   9.   Correctional Officer Branch responded and Plaintiff assisted her in helping McMillan change

11   her sanitary napkin and get dressed.  McMillan was taken to the clinic for evaluation.  The

12   clinic referred McMillan to the prison hospital for further evaluation.  Am. Compl. p.2;

13   Depo. Of Gilbert-Lewis, 22:3-7.  The roommates cleaned up McMillan's mess with gloves

14   and disinfectants given to them by officers.  Depo. of Gilbert-Lewis, 21:3-5.

15   10.   At approximately 7:30 p.m., Sergeant I. Kent entered the room and informed Plaintiff and

16   the other roommates that she was aware of the problem but that McMillan would be

17   returning to the room.  Sergeant Kent advised the roommates that McMillan would be further

18   evaluated by the mental health staff the following morning.  Am. Compl. p. 2.

19   11.   If an inmate poses a threat to other inmates and Sergeant Kent is aware of such a threat and

20   has reason to believe such a threat exists, she can remove the inmate from that situation so

21   as to preserve the safety and security of the institution, other inmates, and staff.  It is Kent's

22   practice to remove inmates whom she believes pose a threat to others and place them in a

23   different dorm, cell, or administrative segregation.  In accordance with that practice, Sergeant

24   Kent can attest that if she did not remove McMillan on May 23, 1999, it was because she did

25   not believe McMillan posed a threat to others.  Sergeant Kent would not leave an inmate in

26   a situation where the inmate or someone else could be harmed.  Decl. of Kent, ¶¶ 4-5.

27   12.   At approximately 8:50 p.m., McMillan began throwing her property on the floor, jumping

28   up and down and screaming.  Correctional Officers Wilson, Baron and Sooter responded and

6

removed everyone out of the room except for McMillan.  The officers spoke to her at length, convinced her to calm down and clean up her mess.  Everyone else was returned to the room and they prepared for the institutional count.  Am Compl. p. 3.

13.  At approximately 11:45 p.m., Plaintiff and McMillan were involved in an altercation during which McMillan scratched Plaintiff.  Am. Compl. p. 3, Dec. of S. Kent, ¶ 5.

14.  Sergeant Eby and Lieutenant S. Kent responded to the room, took everyone out of the room and questioned them separately.  Am. Compl. p. 3.

15.  Lieutenant Kent was the watch commander on the night of the altercation between McMillan and Lewis.  Lieutenant Kent wrote a CDC 114-D, Administrative Segregation Unit Placement Notice, for McMillan advising her of the reasons she was being placed in administrative segregation.  According to the CDC 114-D, McMillan was removed from the housing unit and placed in administrative segregation because on May 23, 1999, at approximately 2345 hours, she was having problems in her assigned room with Plaintiff. Correctional Officer Hall responded to yelling in "A" hall, and observed Plaintiff standing at the door.  Plaintiff stated that McMillan scratched her shoulder when she took papers away from her, which she was tearing up.  McMillan was questioned by Sergeant Eby and admitted to scratching Plaintiff.  McMillan was placed in administrative segregation due to battery on Plaintiff and her being deemed a threat to the safety and security of the institution, staff and others.  Decl. of Kent, ¶¶ 3, 5.

16.  Plaintiff does not believe Sergeant Eby or Lt. Kent were aware that McMillan was having problems in her dorm prior to May 23, 1999.  Depo. of Gilbert-Lewis 37:1-9.

17.  Prior to the incident, Lieutenant Kent was not aware of any issues or problems between Plaintiff and McMillan and he did not have any reason to believe that McMillan's presence in housing unit 506-03 posed a danger or threat to any other inmates.  Decl. of S. Kent, ¶ 6; Depo. of Gilbert-Lewis, 36:20-25, 37:1-9.  Furthermore, as soon as he became aware that McMillan posed a threat to others, she was immediately removed and placed in administrative segregation.  Decl. of S. Kent, ¶ 6.

18.  Lieutenant Kent did not complete a CDC 837, Crime/Incident Report because one was not

1   warranted under the circumstances.  The criteria for a CDC 837, is that a weapon be used or

2   that there is serious bodily injury.  In this case, there was no weapon or serious injury to

3   Plaintiff.  Decl. of S. Kent, ¶ 7.

4   19.   Plaintiff was seen by Medical Technical Assistant (MTA) Rawlings who evaluated her and

5   completed a CDC 7219, Medical Report of Injury or Unusual Occurrence.  MTA Rawlings

6   examined Plaintiff on May 24, 1999, at about 12:10 a.m. and noted on his report that Plaintiff

7   stated, "I/m McMillan attacked me from behind, attempted to strangle me and scratched me."

8   Decl. of Rawlings, ¶ 5.  Rawlings also noted that Plaintiff had sustained three scratches of

9   the right side of the neck.  Rawlings recommended that Plaintiff clean her scratches with

10  soap and water and an alcohol pad.  No further treatment was necessary.  Plaintiff was

11  released to return to her housing unit.  Decl. of Rawlings, ¶ 6.

12  20.   It is Rawlings' practice to thoroughly evaluate an inmate who has been involved in such an

13  incident and to complete a CDC 7219 noting any and all injuries.  If Plaintiff had sustained

14  additional injuries, Rawlings would have noted those on the CDC 7219.  Decl. of Rawlings,

15  ¶ 6.  Furthermore, this incident occurred during first watch and at that time of night, there

16  was no physician on duty.  However, if Plaintiff's injuries were serious and required

17  additional attention, Rawlings would have immediately taken her to the emergency room to

18  be seen by the registered nurse on duty.  Decl. of Rawlings, ¶ 8.

19  21.   The reason Plaintiff was not provided additional treatment or referred to the emergency room

20  was because her injuries were minor scratches and did not require additional medical

21  attention.  Decl. of Rawlings, ¶ 8.

22  22.   There is no medical evidence that Plaintiff was seriously injured on May 23, 1999.  Decl. of

23  S. Suryadevara, M.D. ¶¶ 5, 12.  Plaintiff was seen by medical staff numerous times over the

24  past several years and did not make any complaints of ongoing medical concerns relating to

25  the May 23, 1999 incident.  Decl. of S. Suryadevara, M.D. ¶¶ 6-11.  While Plaintiff did

26  complain during the July 15, 1999 and July 20, 1999 visits about being attacked by another

27  inmate, her discomfort was related to Tonsillitis, not the May 23rd incident.  Decl. of S.

28  Suryadevara, M.D. ¶10.

D.    Discussion

_____*1.    Plaintiff's Allegations*

In her second amended complaint, plaintiff alleges that on May 23, 1999, she was assaulted by inmate McMillan, who suffered from mental health problems and took psychiatric medication at the time of the assault.[2]  Inmate McMillan was placed in a cell with plaintiff and six other inmates on May 20, 1999.  On May 21, 1999, inmate McMillan was "acting strangely," and plaintiff informed correctional officer Schei about this fact.  On May 22, 1999, inmate McMillan banged her head on the bathroom stall several times and pulled her hair out, prompting one of plaintiff's cellmates to inform officer Castellanos of the situation.  Plaintiff alleges that later on May 22, 1999, McMillan was talking to herself in the mirror and began throwing toilet paper at the cellmates.  Officer Castellanos recorded the occurrence in the log book and referred McMillan to "B-yard clinic" for evaluation.  Inmate McMillan was seen at the clinic, and was then returned to plaintiff's cell.  The next day, May 23, 1999, plaintiff found McMillan in the bathroom where she had smeared feces and blood on the walls.  Plaintiff assisted correctional officer Branch in coaxing inmate McMillan out of the bathroom and to the clinic.  Later that evening, correctional sergeant Marquez informed plaintiff that she was aware of plaintiff's safety concerns, but advised her that inmate McMillan would be returning to the room; Sgt. Marquez asked that plaintiff and the other inmates deal with McMillan's presence one more night until she could be evaluated by mental health staff the following morning.  That evening at 8:50 p.m., McMillan got out of bed, threw her property on the floor, jumped around, and screamed.  Correctional officers Wilson, Baron, and Sooter arrived, removed the other inmates from the cell, spoke to McMillan, and then returned Plaintiff and the

---

[2] Verified complaints and oppositions constitute opposing affidavits for purposes of the summary judgment rule if they are based on facts within the pleader's personal knowledge.  Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).  The asserted facts must be based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e).  In conjunction with its review of defendants' motion, the court has treated plaintiff's complaint and opposition as opposing affidavits to the extent possible.

1   other inmates to the cell with McMillan.  Later that night at approximately 11:45 p.m., McMillan

2   "attacked me [plaintiff] from behind, choking me, and as I pried her hands from my throat,

3   consequently scratched and gouged my neck, right scapula and right shoulder; then kicked me once

4   I freed myself."  As a result of the attack, plaintiff suffered "3 moon-shaped avulsions to the neck,

5   contusions and lacerations to the throat, neck and scapula and shoulder areas."   Shortly after the

6   injury, plaintiff informed officer Hall of what had happened.  Officer Hall called Sgt. Eby and Lt.

7   Kent.  The inmates were questioned about the incident.  Plaintiff was taken from the cell and her

8   wounds were inspected by MTA Rawlings who told plaintiff to wash the wounds with soap and

9   water.  Rawlings stated he did not have anything else with him to clean her wounds.  The following

10  morning, plaintiff received no further medical treatment, and was told there were no orders to

11  cleanse her wounds and she had to submit a co-pay in order to see a doctor.

12          Plaintiff states that McMillan's condition deteriorated and within the following month she

13  was housed in a step up room, returned to the EOP, placed on suicide watch in the prison hospital

14  and eventually transferred to Patton State Hospital.

15          Plaintiff alleges that no incident report had been filed regarding her injuries because they

16  were not deemed serious enough by prison staff to warrant a report.  Because plaintiff felt that an

17  incident report should have been filed, she submitted an inmate appeal (602) regarding the incident

18  with inmate McMillan.

19          Plaintiff contends that defendants Baron, Castellanos, Eby, I. Kent, S. Kent, Schei, Sooter

20  and Wilson failed to protect her resulting in an assault by inmate McMillan.  Plaintiff alleges that

21  defendant Rawlings failed to provide adequate medical care for her injuries.

22          *2.      Failure to Protect Claim*

23          To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

24  conditions must involve "the wanton and unnecessary infliction of pain . . . ."  Rhodes v. Chapman,

25  452 U.S. 337, 347 (1981).  Although prison conditions may be restrictive and harsh, prison officials

26  must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety.

27  Id.; Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986); Hoptowit v. Ray, 682 F.2d 1237,

28  1246 (9th Cir. 1982).  Where a prisoner alleges injuries stemming from unsafe conditions of

1    confinement, prison officials may be held liable only if they acted with "deliberate indifference to

2    a substantial risk of serious harm."  Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

3           The deliberate indifference standard involves an objective and a subjective prong.  First, the

4    alleged deprivation must be, in objective terms, "sufficiently serious . . . ."  Farmer v. Brennan, 511

5    U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Second, the prison official

6    must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ."  Farmer, 511 U.S.

7    at 837.  Thus, a prison official may be held liable under the Eighth Amendment for denying humane

8    conditions of confinement only if he knows that inmates face a substantial risk of harm and

9    disregards that risk by failing to take reasonable measures to abate it.  Id. at 837-45.  Prison officials

10   may avoid liability by presenting evidence that they lacked knowledge of the risk, or by presenting

11   evidence of a reasonable, albeit unsuccessful, response to the risk.  Id. at 844-45.  Mere negligence

12   on the part of the prison official is not sufficient to establish liability, but rather, the official's

13   conduct must have been wanton.  Id. at 835; Frost, 152 F.3d at 1128.

14          "What is necessary to show sufficient harm for purposes of the Cruel and Unusual

15   Punishment Clause depends upon the claim at issue . . . ."  Hudson v. McMillian, 503 U.S. 1, 8

16   (1992).  "The objective component of an Eighth Amendment claim is . . . contextual and responsive

17   to contemporary standards of decency."  Id. at 8 (quotations and citations omitted).  "[E]xtreme

18   deprivations are required to make out a[n] [Eighth Amendment] conditions-of-confinement claim."

19   Id. at 9 (citation omitted).  With respect to this type of claim, "[b]ecause routine discomfort is part

20   of the penalty that criminal offenders pay for their offenses against society, only those deprivations

21   denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis

22   of an Eighth Amendment violation."  Id. (quotations and citations omitted).

23          The moving defendants argue they are entitled to summary judgment because there is no

24   evidence which would have led a reasonable person to believe that McMillan was a threat to plaintiff

25   or anyone else, thereby requiring that she be removed from that housing unit.  Defendants therefore

26   argue there is no evidence that they acted with deliberate indifference and they are entitled to

27   judgment as a matter of law of plaintiff's failure to protect claim.  The Court separately addresses

28   plaintiff's allegations and the evidence against each defendant below.

1      *(a)      Defendant Schei*

2      Plaintiff's claim of deliberate indifference against defendant Shei is based on the fact that on

3   Friday, May 21, 1999, plaintiff informed defendant Schei that McMillan was "acting strangely", had

4   not eaten all day and that she hadn't received her medication.  UDF 4.  Plaintiff admits that at time,

5   McMillan was not acting violently toward anyone and that plaintiff's concern was for McMillan.

6   *Id.*  To this point, McMillan had not acted in such a way that a reasonable person could have

7   foreseen the events of May 23, 1999.  The Court finds that Schei is entitled to judgment as a matter

8   of law because based on this undisputed evidence, there are no facts from which he could have

9   drawn an inference that a substantial risk of serious harm existed.

10     *(b)      Defendant Castellanos*

11     Plaintiff's claim against defendant Castellanos is based on the fact that on May 22, 1999, he

12  responded to two incidents with McMillan.  On the first occasion, McMillan was banging her head

13  against the wall.  Officer Castellanos viewed the injury and recorded the occurrence in the daily log

14  book.  UDF 5.  Later the same day, Castellanos responded to the room where McMillan was talking

15  to herself.  UDF 6.  At this time, Castellanos sent McMillan to the clinic for further evaluation.  *Id.*

16  This evidence  is not disputed by plaintiff, nor does plaintiff provide any additional evidence.

17  Plaintiff seems to argue that if Castellanos would have read the log book when he began his shift,

18  he would have known about McMillan's behavior the previous day.  Depo. of Gilbert-Lewis, 14:23-

19  25 - 15:1-7.  However, even if he did, the undisputed evidence establishes that after observing

20  McMillan on two (2) occasions, Castellanos sent her for further evaluation at the clinic.  The Court

21  finds that defendant's response to McMillan's behavior was reasonable under the circumstances and

22  he is entitled to judgment as a matter of law.

23     *(c)      Defendant Sooter*

24     The undisputed evidence establishes that on May 23, 1999, defendant Sooter found McMillan

25  in the bathroom crying, exposed form the waist down, with feces smeared on the walls and blood

26  on the floor.  UDF 8.  Plaintiff voluntarily stayed and helped McMillan while defendant Sooter

27  called for assistance.  *Id.*  At this time, McMillan was referred to the clinic and the clinic referred

28  her to the prison hospital for further evaluation.  UDF 9.  Sooter, like Castellanos responded

appropriately.  That medical staff eventually sent her back to the housing unit, has no bearing on Sooter's liability.  Sooter is also entitled to judgment as a matter of law.

### (d)      Defendant I. Kent

On May 23, 1999, at approximately 7:30 p.m., Sergeant Kent went to talk to plaintiff and the other inmates and informed them that she was aware of the problems but that McMillan would be returning to the room.  UDF 10.  The evidence establishes that while McMillan had been acting strangely the previous two days, she had not been violent towards anyone.  She had been evaluated by the clinic and medical staff and released back to her room.  Based on this evidence, it was not unreasonable for Sergeant Kent to allow McMillan to remain in the room.  While in hindsight her judgment was perhaps in error, the evidence does not establish that she was deliberately indifferent to a substantial risk to Plaintiff.

### (e)      Defendants Wilson, Baron and Sooter

Th undisputed evidence shows that defendants Wilson, Baron and Sooter responded to the room on May 23, 1999 at about 8:30 p.m. in response to McMillan throwing her property to the floor, jumping up and down on it and screaming.  UDF 12.  Plaintiff alleges the officers removed everyone from the room except McMillan, who they spoke to at length and convinced to calm down and clean up the mess.  *Id.*  The officers then left to prepare for the institutional count.  It was not until 11:45 p.m that Plaintiff was attacked by McMillan.  UDF 13.  Plaintiff supplies no other evidence in support of her claims against defendants Wilson, Baron and Sooter and therefore, the Court finds these defendants are also entitled to judgment as a matter of law in that there is no evidence that they were deliberately indifferent to a serious risk to plaintiff.

### (f)      Defendants Eby and S.Kent

Sergeant Eby and Lieutenant Kent responded on May 23, 1999 at about 11:45 p.m., after the altercation between Plaintiff and McMillan.  UDF 14.  Plaintiff does not believe these defendants had any knowledge of McMillan's problems prior to this.  *See* Depo. of Gilbert-Lewis, 36:20-25 - 37:1-9.  Accordingly, defendants Eby and Kent are entitled to judgment as a matter of law as there is no evidence that either had knowledge of any risk to plaintiff.  While plaintiff argues that defendant Kent should have filed an incident report regarding the altercation, there is no evidence

1    that his failure to do so resulted in any harm to plaintiff.

2            In summary, as to defendants Baron, Castellanos, Eby, I. Kent, S. Kent, Schei, Sooter and

3    Wilson, Plaintiff has presented no evidence that these defendants could have or should have taken

4    steps to protect her from the unfortunate attack by inmate McMillan, beyond those that they did.  To

5    the extent plaintiff claims the mental health polices at the prison which permitted McMillan to be

6    housed in plaintiff's dorm, caused her injuries, she has failed to submit any evidence that these

7    defendants had any control over inmate McMillan's placement.  Accordingly, the court finds that

8    defendants are entitled to judgment as a matter of law on plaintiff's Eighth Amendment claim against

9    them.

10           *3.      Deliberate Indifference to Serious Medical Need*

11           Plaintiff alleges that MTA Rawlings failed to adequately treat her injuries on May 23, 1999.

12   Defendants argue that there is no evidence that defendant Rawlings was deliberately indifferent to

13   Plaintiff's medical needs.

14           Rawlings arrived to see Plaintiff after the altercation.  UDF 19.  He looked at her wounds and

15   instructed her to wash them with soap and water.  *Id.*  Plaintiff states that she asked him to cleanse

16   them due to the incident earlier involving blood and feces.  Am. Compl. p. 3.  Plaintiff states that

17   he gave her an alcohol pad and told her that was all he had but that he would return later.  *Id.*

18   Plainitff contends Rawlings never returned and she went to the clinic the following morning where

19   she was told that there were no orders to cleanse her wounds and that she would have to submit a

20   co-pay to see a doctor. Am. Compl. p.4.  Rawlings completed a CDC 7219 Medical Report of Injury

21   or Unusual Occurrence which states that Plaintiff sustained three scratches on the right side of the

22   neck.  UDF 19.  While Rawlings doesn't specifically remember the incident, he states that it is his

23   practice to thoroughly evaluate an inmate who has been involved in an incident such as the one at

24   issue here, and if Plaintiff's injuries were serious and required medical attention, he would have

25   immediately taken her to the emergency room.  Decl. of Rawlings, ¶ 8.

26           To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

27   conditions must involve "the wanton and unnecessary infliction of pain."  Rhodes v. Chapman, 452

28   U.S. 337, 347 (1981).  A prisoner's claim of inadequate medical care does not rise to the level of an

Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate indifference in doing so.'" Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)).  A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment," or in the manner "in which prison physicians provide medical care." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  Where a prisoner is alleging a delay in receiving medical treatment, as plaintiff is here, the delay must have led to further harm in order for the prisoner to make a claim of deliberate  indifference to serious medical needs. McGuckin, 974 F.2d at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." Toguchi, 391 F.3d at 1060.  "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer, 511 U.S. at 837).  "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).

The undisputed facts establish that after Plaintiff was assaulted and injured on May 23, 1999, defendant Rawlings provided her with the medical care he thought was appropriate given what he viewed as minor injuries.  Plaintiff has submitted no evidence that defendant Rawlings knew of and disregarded an excessive risk to plaintiff's health.  Farmer, 511 U.S. at 834.  Indeed, Plaintiff was seen by medical staff later and there is no medical evidence that she was seriously injured on May 23, 1999.  UDF 22.  Even if defendant Rawlings erred in his assessment of plaintiff's injuries, there is no evidence that he was deliberately indifferent to her needs.  Plaintiff's opinion as to the urgency of her condition and what should have been done to treat it more immediately is insufficient to raise a triable issue of fact with respect to whether defendant acted with deliberate indifference to a serious

1   medical need.  Because plaintiff has not presented any evidence that defendant Rawlings acted with

2   deliberate indifference during his involvement in plaintiff's medical care, defendant Rawlings is

3   entitled to judgment as a matter of law on plaintiff's claim against him.

4   V.      Conclusion

5           The court finds that defendants are entitled to judgment as a matter of law on plaintiff's claim

6   that they violated the Eighth Amendment by acting with deliberate indifference to plaintiff's safety

7   and to her medical needs.  Therefore, it is HEREBY RECOMMENDED that Defendants' motion

8   for summary judgment, filed December 22, 2005, be GRANTED, thus concluding this action in its

9   entirety.

10          These Findings and Recommendations will be submitted to the United States District Judge

11  assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30)**

12  **days** after being served with these Findings and Recommendations, the parties may file written

13  objections with the court.  The document should be captioned "Objections to Magistrate Judge's

14  Findings and Recommendations."  The parties are advised that failure to file objections within the

15  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d

16  1153 (9th Cir. 1991).

17

18          IT IS SO ORDERED.

19      **Dated:    June 23, 2006**              **/s/ Dennis L. Beck**
20      3b142a                                   UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28